Filed 1/30/23  Keep 70 Safe v. Dept. of Transportation CA3

# NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Yuba)

----

| | |
|---|---|
| KEEP 70 SAFE, | C095543 |
| Plaintiff and Appellant, | (Super. Ct. No. CV PT 20-00779) |
| v. | |
| DEPARTMENT OF TRANSPORTATION, | |
| Defendant and Respondent. | |

California's Department of Transportation (Caltrans) approved a project to improve 9.6 miles of State Route 70 (SR 70) in Yuba County by adding, among other things, continuous passing lanes in both directions.  Keep 70 Safe, an unincorporated association of area residents, challenged the project under the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.[1]), first in federal court, and

---

[1]    Undesignated statutory references are to the Public Resources Code.

1

then in the Yuba County Superior Court. After overruling Caltrans's demurrer, which sought dismissal of the action for failure to file in the appropriate forum within the applicable statute of limitations, the trial court ruled in Caltrans's favor on the merits and denied Keep 70 Safe's petition for writ of mandate, concluding "that the environmental review of the project was not improperly 'piecemealed'; that the [environmental impact report] properly determined, supported by substantial evidence, that the project would not result in significant impacts; that the [environmental impact report] included a reasonable range of alternatives; and that [Keep 70 Safe] failed to meet its burden to show that the [environmental impact report] is inadequate."

Keep 70 Safe challenges each of these conclusions on appeal. Caltrans defends the trial court's ruling and also renews its statute of limitations defense.[2] We affirm. As we shall explain, while Keep 70 Safe's CEQA action is not time-barred, the trial court correctly denied the petition for writ of mandate on the merits. In reaching the latter conclusion, we reject Keep 70 Safe's specific arguments that unlawful piecemealing occurred, that the EIR did not consider an adequate range of alternatives, that Caltrans was procedurally required to make certain specific findings and commit to various mitigation measures because the final environmental impact report (EIR) found significant impacts to the environment, and that substantial evidence does not support the EIR's findings of no significant impact to the environment in seven specific respects.

---

[2] Caltrans has also moved to strike portions of the appellant's appendix, specifically, a declaration from Keep 70 Safe's attorney and exhibits attached thereto, which was filed in the trial court along with Keep 70 Safe's opposition to Caltrans's demurrer to the writ petition. We deny the motion. We also deny Caltrans's application to file a reply to Keep 70 Safe's opposition to this motion. Finally, we further deny Caltrans's motion to strike portions of Keep 70 Safe's reply brief. We note, however, that new arguments raised in the reply brief are not properly before this court and shall not be discussed in this opinion.

BACKGROUND

We begin with a general overview of Caltrans's approval of the project and then describe the present lawsuit, reserving the more technical details of the project for our discussion of Keep 70 Safe's substantive challenges under CEQA, and also reserving the specific facts of Keep 70 Safe's foray into federal court for our discussion of the statute of limitations.

*Approval of the Project*

SR 70 is a north-south transportation corridor in the eastern Sacramento Valley that begins roughly 14 miles north of the City of Sacramento, at its juncture with State Route 99 (SR 99), continues north through the cities of Marysville and Oroville, then continues northeast through the Lake Oroville State Recreation Area and Lassen National Forest, then southeast through Plumas National Forest, and ultimately terminates at its junction with U.S. Highway 395 on the eastern side of the Sierra Nevada mountains.

The segment of SR 70 comprising the project in this case is a 9.6-mile span of rural highway north of Marysville, from Laurellen Road to Honcut Creek Bridge. Plans to improve this segment of highway were included in a 2014 transportation concept report (TCR), which proposed several projects for the purpose of "improving [SR 70] to freeway and expressway standards along some segments, and maintaining conventional highway standards along others." With respect to the segment at issue in this case, the report notes that "agricultural land predominates along the route" and is "interspersed with rural, low-density residential development."[3] The road itself "is a two-lane conventional highway" with driveway access for various farms and residences along the

---

[3] The project roughly corresponds to segment 8 described in the TCR. Segment 8 begins at post mile (PM) 15.35 and ends at PM 25.822, whereas the project begins at PM 16.2 and ends at PM 25.8. Thus, segment 8 extends about a mile further south into Marysville.

3

route. The TCR recommended improving this segment "by constructing passing lanes and center two-way left turn lane" in order to improve operational conditions from level of service (LOS) E, which "falls below the minimum acceptable LOS D for a rural area," to LOS A, "represent[ing] the best operating conditions wherein there is ample maneuverability without speed restriction or delay."

In February 2020, Caltrans gave notice that it would be preparing a draft EIR for the project.[4] The draft EIR, prepared the following month, explained that the project's purpose was "to achieve the ultimate facility as outlined in the 2014 [TCR]." The draft EIR analyzes two build alternatives, alternative 1 and alternative 2, as well as a no project alternative. The existing roadway consisted of two 12-foot lanes with shoulder widths of no more than eight feet. A separate safety project was already scheduled for construction, which would add a 14-foot two-way left turn lane, designated turn pockets at county roads, and several opportunities for slow moving vehicles to pull over in each direction. Both build alternatives would "construct an additional 12-foot lane with an 8-foot shoulder to achieve a continuous passing lane in each direction throughout the project limits." They would also include a clear recovery zone (CRZ) with "a minimum width of 20 feet" and "side slopes of 4:1 or flatter," requiring the removal of any trees, utility poles, or other obstructions along the route. Roadside ditches would also be constructed outside the CRZ. For alternative 1, however, the safety project's two-way left turn lane would be retained, "resulting in a five-lane facility." For alternative 2, that

_____

**4** In the meantime, two project study reports were prepared (in 2015 and 2019, respectively) for various proposed safety improvements on SR 70, including "two standard 12-foot lanes, 8-foot shoulders[,] a [two-way left turn lane] where feasible, left-turn pockets at all county-maintained roads, and a 20-[foot clear recovery zone]," as well as a 2019 safety assessment report, "conclud[ing] that an additional reduction of approximately 34 percent . . . for fatality and injury collisions could be expected with the conversion from a 3-lane to a 5-lane cross section based on the comparison of similar sites."

left turn lane would not be retained, and would instead be a 14-foot median with a concrete barrier dividing the two lanes of travel in each direction. Thus, under this alternative, "[v]ehicles entering the highway from homes and businesses would only be able to turn right onto SR 70," with designated locations "to accommodate out of direction travel."

The draft EIR was circulated to the public on April 1, 2020. During the public comment period, Keep 70 Safe submitted a comment letter arguing that the draft EIR improperly separated the current project from several other SR 70 improvement projects that "were intended to be carried out together" and therefore did not "take into account the 'whole of the action.' " The comment letter also argued, among other things, that the draft EIR failed to analyze a reasonable range of alternatives, and failed to adequately disclose, analyze, and mitigate various significant environmental impacts.

The final EIR, including a determination "that Alternative 1 will have no significant impact on the human environment," was issued on July 16, 2020. Five days later, Caltrans filed a notice of determination stating, among other things, that the project would have no significant impact on the environment, an EIR was prepared, mitigation measures were not made a condition of project approval, and findings were not made pursuant to CEQA.

### *The Present Lawsuit*

On October 23, 2020, Keep 70 Safe filed the present lawsuit, seeking a writ of mandate compelling Caltrans to vacate its certification of the final EIR and approval of the project. Keep 70 Safe renewed its claims of improper piecemealing and failure to analyze a reasonable range of alternatives. Keep 70 Safe also argued Caltrans failed to make required findings or incorporate mitigation measures into the project when the final EIR "relied upon mitigation of potential impacts to aesthetics, cultural resources, geology, hazardous materials, hydrology and water quality, transportation, and emergency response to determine that the Project could have a less than significant

5

impact." Finally, Keep 70 Safe argued the final EIR inadequately analyzed potential impacts to hydrology, water quality, and transportation, resulting in insufficient evidence to support Caltrans's determinations that the project would not significantly impact the environment in these areas.

In response, Caltrans argued it did not improperly piecemeal its environmental review of the project, substantial evidence supports its determinations of no significant impact in the areas of cultural resources, aesthetics, transportation and emergency services, hazardous materials, geology, hydrology and water quality, and biological resources, and the EIR included a reasonable range of alternatives.

The trial court denied the petition, concluding "that the environmental review of the project was not improperly 'piecemealed'; that the EIR properly determined, supported by substantial evidence, that the project would not result in significant impacts; that the EIR included a reasonable range of alternatives; and that [Keep 70 Safe] failed to meet its burden to show that the EIR is inadequate."

Judgment was entered in Caltrans's favor on October 22, 2021. This appeal followed.

DISCUSSION

I

*CEQA Overview and Standard of Review*

"With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment. [Citations.] 'Project' means, among other things, '[a]ctivities directly undertaken by any public agency.' [Citation.] ' "Significant effect on the environment" means a substantial, or potentially substantial, adverse change in the environment.' [Citations.] The Legislature has made clear that an EIR is 'an informational document' and that '[t]he purpose of an environmental impact report is to provide public agencies and the public in general with detailed information about the effect which a proposed

6

project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' [Citations.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390-391, fns. omitted (*Laurel Heights*).)

"The EIR is the primary means of achieving the Legislature's considered declaration that it is the policy of this state to 'take all action necessary to protect, rehabilitate, and enhance the environmental quality of the state.' [Citation.] The EIR is therefore 'the heart of CEQA.' [Citations.] An EIR is an 'environmental "alarm bell" whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return.' [Citations.] The EIR is also intended 'to demonstrate to an apprehensive citizenry that the agency has, in fact, analyzed and considered the ecological implications of its action.' [Citations.] Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees. [Citations.] The EIR process protects not only the environment but also informed self-government." (*Laurel Heights*, *supra*, 47 Cal.3d at p. 392.)

Our review of Caltrans's compliance with CEQA in this case " 'extend[s] only to whether there was a prejudicial abuse of discretion.' [Citation.] Such an abuse is established 'if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' [Citations.]" (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 426-427, fn. omitted (*Vineyard*).) "Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's substantive

7

factual conclusions. In reviewing for substantial evidence, the reviewing court 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.' [Citation.]" (*Id.* at p. 435.)

"Whether an EIR has omitted essential information is a procedural question subject to de novo review." (*Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, 935.) However, we do not " 'pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document.' [Citation.] [¶] This standard of review is consistent with the requirement that the agency's approval of an EIR 'shall be supported by substantial evidence in the record.' [Citation.] In applying the substantial evidence standard, 'the reviewing court must resolve reasonable doubts in favor of the administrative finding and decision.' [Citation.] The Guidelines[5] define 'substantial evidence' as 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' [Citation.]" (*Laurel Heights*, *supra*, 47 Cal.3d at pp. 392-393.)

Finally, we review "the agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo. [Citations.] We therefore resolve the substantive CEQA issues . . . by independently determining whether the administrative record demonstrates any legal error by [Caltrans] and whether it contains substantial evidence to support [Caltrans's] factual determinations." (*Vineyard*, *supra*, 40 Cal.4th at p. 427.)

---

**5** References to "Guidelines" are to the State CEQA Guidelines, which implement the provisions of CEQA. (Cal. Code Regs., tit. 14, § 15000 et seq.)

## II

### *Statute of Limitations*

We first address Caltrans's assertion that this action is time-barred. As a preliminary matter, this issue is properly before us notwithstanding the fact that Caltrans did not file a cross-appeal. " 'As a general rule, respondents who fail to file a cross-appeal cannot claim error in connection with the opposing party's appeal. [Citation.] A limited exception to this rule is provided by [Code of Civil Procedure] section 906, which states in pertinent part: "The respondent . . . may, without appealing from [the] judgment, request the reviewing court to and it may review any of the foregoing [described orders or rulings] for the purpose of determining whether or not the appellant was prejudiced by the error or errors upon which [the appellant] relies for reversal or modification of the judgment from which the appeal is taken." ' " (*Khorsand v. Liberty Mutual Fire Ins. Co.* (2018) 20 Cal.App.5th 1028, 1034.) If, as Caltrans argued below, Keep 70 Safe's action is barred by the statute of limitations, it necessarily suffered no prejudice from the trial court's denial of the writ petition on the merits. (See, e.g., *Westinghouse Electric Corp. v. County of Los Angeles* (1982) 129 Cal.App.3d 771, 781 [respondent county allowed to complain of trial court's ruling on issue of standing].)

### A.

### *Additional Background*

The notice of determination in this case was filed on July 21, 2020. On August 20, 2020, Keep 70 Safe filed an action in federal court challenging Caltrans's approval of the project under CEQA and the National Environmental Policy Act of 1969 (NEPA) (42 U.S.C. § 4321 et seq.).

On September 30, 2020, attorneys for Caltrans met with Keep 70 Safe's attorney and informed him of Caltrans's intent to move to dismiss the lawsuit. With respect to the CEQA claims, Caltrans attorneys cited *Raygor v. Regents of the Univ. of Minn.* (2002) 534 U.S. 533 (*Raygor*), and explained that "supplemental jurisdiction . . . does not extend

9

against the state, state agencies, and state officials, when the state has not clearly consented to federal courts adjudicating the state law claim against the state . . . ." The promised motion to dismiss was filed on October 9, 2020. Rather than file an opposition to the motion, Keep 70 Safe amended the federal pleading to omit the CEQA claims and filed the present lawsuit in state court on October 23, 2020.

Caltrans's demurrer on statute of limitations grounds was overruled. Although the 30-day period of limitations, extended by a "Covid emergency rule," expired on September 2, 2020, the trial court applied the doctrine of equitable tolling. The trial court concluded Keep 70 Safe's "filing of the federal case was not unreasonable or in bad faith," even though the Eleventh Amendment entitled Caltrans to dismissal of the CEQA claims, because Caltrans had consented to supplemental federal court jurisdiction over CEQA claims in the past. It was also reasonable, the trial court concluded, for Keep 70 Safe to wait until October 23 to dismiss the CEQA claims from the federal lawsuit and file the present lawsuit because Caltrans "may have decided to change its mind" and Keep 70 Safe "was entitled to use the time allowed by the federal rules to file an opposition to thoroughly research the question." Finally, the trial court concluded Caltrans suffered no prejudice from the delay in filing the lawsuit in state court.

**B.**

*Analysis*

"Statutes of limitations are designed 'to prevent stale claims, give stability to transactions, protect settled expectations, promote diligence, encourage the prompt enforcement of substantive law, and reduce the volume of litigation.' [Citation.]" (*Coalition for an Equitable Westlake/MacArthur Park v. City of Los Angeles* (2020) 47 Cal.App.5th 368, 378.)

"CEQA 'provides "unusually short" limitations periods [citation] after which persons may no longer mount legal challenges, however meritorious, to actions taken under the Act's auspices.' [Citation.]" (*Committee for Sound Water & Land*

10

*Development v. City of Seaside* (2022) 79 Cal.App.5th 389, 400 (*City of Seaside*).) The

limitations period for an action "alleging that a public agency has improperly determined

whether a project may have a significant effect on the environment," or "alleging that an

[EIR] does not comply with [CEQA]," is 30 days from the date of the filing of the notice

of determination. (§ 21167, subds. (b), (c).) "A bright-line rule that the filing of [a]

[notice of determination] triggers a 30-day statute of limitations promotes certainty,

allowing local governments and developers to proceed with projects without the threat of

potential future litigation." (*Committee for Green Foothills v. Santa Clara County Bd. of

Supervisors* (2010) 48 Cal.4th 32, 50 (*Committee for Green Foothills*).)

Here, however, while the 30-day limitations period would have commenced on the

date of the filing of the notice of determination, July 21, 2020, an emergency rule adopted

by the Judicial Council in response to the coronavirus disease 2019 (COVID-19)

pandemic effectively tolled the statute of limitations until August 3, 2020.[6] (*City of*

---

[6]     "On March 4, 2020, Governor Gavin Newsom declared a state of emergency as a
result of the threat of COVID-19, and on March 19, 2020, issued an executive order
directing all Californians not providing essential services to stay home. [Citation.] The
order did not close the courts, which provide an essential service. [Citation.] [¶] On
March 23, 2020, Chief Justice Tani G. Cantil-Sakauye, pursuant to her authority under
the California Constitution, article VI, section 6, and Government Code section 68115,
issued an order authorizing superior courts to adopt proposed local rules or local rule
amendments to address the impact of the COVID-19 pandemic to take effect
immediately, without advance circulation for 45 days of public comment. [Citation.] [¶]
On March 27, 2020, the Governor issued Executive Order No. N-38-20, which
'suspended any limitations in Government Code section 68115 or any other provision of
law that limited the Judicial Council's ability to issue emergency orders or rules, and
suspended statutes that may be inconsistent with rules the Judicial Council may adopt.'
[Citation.] [¶] Acting on that authority, on April 6, 2020, the Judicial Council adopted 11
emergency rules." (*E.P. v. Superior Court* (2020) 59 Cal.App.5th 52, 54-55, fn. omitted.)
"As originally adopted on April 6, 2020, Emergency rule 9 tolled all statutes of limitation
for civil causes of action until 90 days after the Governor declared that the state of
emergency related to the COVID-19 pandemic is lifted. [Citation.] The Judicial Council
subsequently received comments regarding the impact of Emergency rule 9 on CEQA

11

*Seaside*, *supra*, 79 Cal.App.5th at pp. 401-402.) Thus, the 30-day limitations period started on that date, and as the trial court correctly calculated, the last day to timely file a lawsuit within the limitations period was September 2, 2020.

Keep 70 Safe's action in federal court was filed on August 20, 2020, within the limitations period, but its action in state court was filed on October 23, 2020, well outside it, unless the doctrine of equitable tolling applies to toll the limitations period while the case was pending in federal court.

Caltrans argues the trial court erred in applying this doctrine because (1) "the legislative intent and public policy reasons for the short statute of limitations in CEQA prohibit the application of equitable tolling," and (2) "filing the CEQA claims in federal court was unreasonable" and Keep 70 Safe "delayed initiating this action after any possible equitably tolled period." We are not persuaded.

**1.**

***Applicability of Equitable Tolling to CEQA Generally***

"Equitable tolling is a 'judicially created, nonstatutory doctrine' that ' "suspend[s] or extend[s] a statute of limitations as necessary to ensure fundamental practicality and fairness." ' [Citation.] The doctrine applies 'occasionally and in special situations' to 'soften the harsh impact of technical rules which might otherwise prevent a good faith litigant from having a day in court.' [Citation.] Courts draw authority to toll a filing

actions, as stated in the Circulating Order: 'Shortly after adoption of the rule, the Judicial Council began receiving comments that raised issues concerning the application of the amended rule to actions brought under [CEQA], which has particularly short deadlines, generally 30 or 35 days.' [Citation.] [¶] Thereafter, the Judicial Council amended Emergency rule 9 by adopting, among other things, subdivision (b), effective May 29, 2020, as follows: 'Tolling statutes of limitations for civil causes of action [¶] . . . [¶] (b) Tolling statutes of limitations of 180 days or less [¶] Notwithstanding any other law, the statutes of limitations and repose for civil causes of action that are 180 days or less are tolled from April 6, 2020, until August 3, 2020.' [Citation.]" (*City of Seaside*, *supra*, 79 Cal.App.5th at pp. 401-402, fn. omitted.)

deadline from their inherent equitable powers—not from what the Legislature has declared in any particular statute. [Citation.] For that reason, we presume that statutory deadlines are subject to equitable tolling." (*Saint Francis Memorial Hospital v. State Dept. of Public Health* (2020) 9 Cal.5th 710, 719-720 (*Saint Francis*).)

For example, in *Addison v. State of California* (1978) 21 Cal.3d 313 (*Addison*), the plaintiffs filed an action in federal court against the State of California and Santa Clara County, alleging both a federal civil rights violation and three state law tort causes of action, within the six-month limitations period for bringing such actions. (*Id*. at pp. 315-317.) When the defendants moved to dismiss the federal court action for lack of jurisdiction, the plaintiffs, "anticipating an adverse ruling on the motion, filed their complaint in the present [state court] action," outside that six-month time period. (*Id*. at p. 317.) Our Supreme Court applied the doctrine of equitable tolling and concluded the limitations period was suspended while the federal court action was pending. (*Id*. at pp. 315, 321.) The court explained that "the doctrine of equitable tolling requires timely notice, and lack of prejudice, to the defendant, and reasonable and good faith conduct on the part of the plaintiff." (*Id*. at p. 319.) With respect to the latter requirement, the court explained: "As noted, the federal court, without prejudice, declined to assert jurisdiction over a timely filed state law cause of action and plaintiffs thereafter promptly asserted that cause in the proper state court. Unquestionably, the same set of facts may be the basis for claims under both federal and state law. We discern no reason of policy which would require plaintiffs to file simultaneously two separate actions based upon the same facts in both state and federal courts since 'duplicative proceedings are surely inefficient, awkward and laborious.' [Citations.]" (*Ibid*.) With respect to notice, the court explained that the timely federal court action provided the defendants with notice and an opportunity to gather evidence and prepare a defense. Finally, defendants suffered no prejudice because the state court action "was filed within one week of the dismissal of the federal suit." (*Ibid*.)

13

However, our Supreme Court has also explained that the doctrine of equitable tolling " 'is not immune' from the operation of statutes," and courts "may conclude that explicit statutory language or a manifest policy underlying a statute simply cannot be reconciled with permitting equitable tolling, 'even in the absence of an explicit prohibition.' " (*Saint Francis*, *supra*, 9 Cal.5th at p. 720.) In *Saint Francis*, the court applied the doctrine to Government Code section 11523's 30-day statute of limitations for seeking writs of administrative mandate. (*Saint Francis*, at p. 717.) The court found no indication in either the operative language of the statute ("the petition shall be filed within 30 days after the last day on which reconsideration can be ordered" (Gov. Code, § 11523)), or in the short length of the limitations period, that the Legislature intended "to forbid the availability of equitable tolling." (*Saint Francis*, at p. 720.) With respect to the latter point, the court stated: "A 10-year statute of limitations, we've reasoned, is 'so "exceptionally long" ' that it 'indicates the Legislature's effort to provide, within the strict statutory period itself, a reasonable time to' file suit. [Citation.] But [Government Code] section 11523's 30-day limitations period is relatively brief, so it carries with it no such inference." (*Ibid*.) After rejecting two specific arguments raised by the respondent, the court concluded: "A requirement that parties seek judicial review within 30 days . . . doesn't prohibit courts' exercise of their equitable powers to toll that limitations period when justice so requires." (*Id*. at p. 721.) The court also found no " 'clear intent' " in the legislative history "that equitable tolling ought not be available under [Government Code] section 11523." (*Id*. at p. 722.)

Here, as in *Saint Francis*, Caltrans has not pointed to any specific statutory language or manifest policy underlying CEQA that would preclude operation of the doctrine of equitable tolling. To be sure, as our colleagues at the First Appellate District acknowledged in *Salmon Protection & Watershed Network v. County of Marin* (2012) 205 Cal.App.4th 195 (*Salmon Protection*), "there is a strong public policy, recognized in numerous decisions, favoring the prompt disposition of CEQA challenges." (*Id*. at

p. 201; see also *Alliance for Protection of Auburn Community Environment v. County of Placer* (2013) 215 Cal.App.4th 25, 32-33 (*Alliance for Protection*) ["CEQA . . . aims to ensure extremely prompt resolution of lawsuits claiming noncompliance with the act"].) However, the same can be said with respect to any claims subject to a short statute of limitations. That alone is not enough. What is required in order to conclude equitable tolling does not apply is a clear expression of such an intent. (*Saint Francis*, *supra*, 9 Cal.5th at p. 722.)

Moreover, in *Salmon Protection*, while acknowledging that CEQA's short statute of limitations indicated an obvious " ' "legislative concern that CEQA challenges . . . must not be permitted to drag on to the potential serious injury of the real party in interest" ' " (*Salmon Protection*, *supra*, 205 Cal.App.4th at p. 201, quoting *Committee for Green Foothills*, *supra*, 48 Cal.4th at p. 50), the court nevertheless concluded tolling agreements are permissible under CEQA because of the "equally strong public policy, . . . recognized in just as many cases, to encourage the settlement of controversies in preference to litigation." (*Salmon Protection*, at p. 201.) If the parties to a CEQA action may agree to toll the statute of limitations, we see no reason a trial court may not exercise its equitable powers to do so "when justice so requires." (*Saint Francis*, *supra*, 9 Cal.5th at p. 721.)

Nor are we persuaded by Caltrans's reliance on certain language in this court's *Alliance for Protection* decision. There, the trial court sustained the defendant's demurrer without leave to amend because the plaintiff's writ petition under CEQA was filed three days after the 30-day limitations period expired. (*Alliance for Protection*, *supra*, 215 Cal.App.4th at p. 29.) On appeal, the plaintiff argued the trial court erred because Code of Civil Procedure "section 473 provides relief from its excusable mistake that resulted in the late filing of the CEQA petition." (*Id*. at p. 30.) We disagreed and affirmed the judgment. As we explained, the plaintiff's primary difficulty in making this argument was our Supreme Court's decision in *Maynard v. Brandon* (2005) 36 Cal.4th

15

364, in which the court concluded "that [Code of Civil Procedure] section 473 could not relieve a party from the consequences of running afoul of the 30-day deadline for seeking a trial following an arbitration." (*Alliance for Protection,* at p. 31; see *id.* at p. 30.) We also noted that a prior Court of Appeal decision, *Kupka v. Board of Administration* (1981) 122 Cal.App.3d 791, relied upon in *Maynard*, concluded that "a plaintiff's innocent mistake, not caused by the defendant, will not excuse a late filing." (*Alliance for Protection*, at p. 32.) Then, in describing the CEQA statute of limitations, we stated, "*section 21167 makes no provision for extending the limitations period on a showing of good cause.*" (*Ibid.*, italics added.)

It is the foregoing italicized language that Caltrans cites, out of context, in an apparent attempt to suggest that the CEQA statute of limitations cannot be equitably tolled. But this statement was made in the context of our conclusion that Code of Civil Procedure section 473 cannot relieve a party from CEQA's statute of limitations. It says nothing about the doctrine of equitable tolling, the applicability of which was not at issue in the case. "It is axiomatic that cases are not authority for propositions not considered." (*People v. Ault* (2004) 33 Cal.4th 1250, 1268, fn. 10; *Howard Jarvis Taxpayers Assn. v. Newsom* (2019) 39 Cal.App.5th 158, 169.)

**2.**

***Application of Equitable Tolling in This Case***

We first note that Caltrans does not argue either that it lacked sufficient notice of Keep 70 Safe's claims or that it suffered any prejudice from the filing in federal court. Nor could it successfully make either argument in light of the *Addison* decision, discussed above. (See *Addison*, *supra*, 21 Cal.3d at p. 319.) Caltrans does argue that filing these CEQA causes of action in federal court was unreasonable following the United States Supreme Court's decision in *Raygor*, *supra*, 534 U.S. 533. We disagree.

In *Raygor*, state law claims asserted by the plaintiffs in federal court against the state university defendant were dismissed on Eleventh Amendment grounds and then

16

refiled in state court past the limitations period. (*Raygor*, *supra*, 534 U.S. at pp. 535-536.) The trial court dismissed the lawsuit, agreeing with the university's argument that "the tolling provision of the federal supplemental jurisdiction statute, 28 [United States Code, section] 1367, did not apply to toll the limitations period on the state law claims while they were pending in federal court." (*Id.* at p. 538.) The Minnesota Supreme Court concluded that while the federal tolling provision facially applied to the plaintiffs' claims, it was unconstitutional as applied "to state law claims against an unconsenting state defendant first filed in federal court but then dismissed and brought in state court." (*Id.* at p. 539.) The United States Supreme Court affirmed the judgment dismissing the lawsuit, but concluded the federal supplemental jurisdiction statute, including its tolling provision, did not apply to such claims in the first place. The court first noted that prior to the enactment of that statute, it had already "held that the Eleventh Amendment bars the adjudication of pendent state law claims against nonconsenting state defendants in federal court." (*Id.* at pp. 540-541, citing *Pennhurst State School & Hosp. v. Halderman* (1984) 465 U.S. 89, 120.) Thus, if Congress wanted the federal supplemental jurisdiction statute to apply to state law claims against nonconsenting state defendants, the intent to abrogate "the sovereign immunity guaranteed by the Eleventh Amendment" must be " ' "unmistakably clear in the language of the statute." ' [Citation.]" (*Raygor,* at p. 541.) There was no clear expression of any such intent. (*Id.* at pp. 541-542.) Nor was there any clear expression of intent for that statute's tolling provision to nevertheless apply to state law claims filed against nonconsenting state defendants in federal court that are subsequently dismissed on Eleventh Amendment grounds. (*Raygor,* at pp. 542-545.)

Thus, under the Eleventh Amendment, Caltrans was entitled to dismissal of the CEQA claims filed in federal court unless it consented to federal supplemental jurisdiction. And under *Raygor*, the tolling provision of the federal supplemental jurisdiction statute did not apply to suspend the statute of limitations applicable to those claims. However, as the trial court explained in its ruling on the demurrer, Caltrans could

17

have consented to federal court jurisdiction. It has apparently done so in the past. (See *City of Carmel-By-The-Sea v. U.S. Dept. of Transp.* (9th Cir. 1997) 123 F.3d 1142, 1163-1165 [adjudicating CEQA claims brought against Caltrans].)[7] In these circumstances, we cannot conclude filing the lawsuit in federal court was unreasonable.

Nor are we persuaded by Caltrans's argument that "published and unpublished decisions indicate Caltrans does not regularly forfeit the State's sovereign immunity," other "litigants filed state and federal environmental claims against Caltrans separately and in the appropriate courts," and "no cases since *Raygor* suggest Caltrans forfeits its sovereign immunity to allow state law claims to proceed against it in federal court." This may well be true, but it does not necessarily render Keep 70 Safe's federal filing unreasonable, particularly in light of the fact that our Supreme Court in *Addison* did not find it unreasonable to file that lawsuit in federal court even though that case also had to be dismissed for lack of jurisdiction.

For the foregoing reasons, we conclude the 30-day statute of limitations, which commenced on August 3, 2020, was tolled 17 days later, on August 20, 2020, when the federal lawsuit was filed, leaving 13 days on the clock. The more difficult question is whether it became unreasonable for Keep 70 Safe to delay dismissing the CEQA causes

---

**7**     Caltrans complains that *Carmel-By-The-Sea* does not discuss how the federal court obtained jurisdiction over the CEQA claims in that case and also notes that the decision predates *Raygor*, arguing "what may have been reasonable reliance on an unsettled area of law in 1997 cannot be deemed reasonable after 2002." We acknowledge that the *Carmel-By-The-Sea* decision does not discuss federal supplemental jurisdiction and was decided before *Raygor*. However, the law in this respect was not unsettled prior to 2002. As noted above, the United States Supreme Court held "that the Eleventh Amendment bars the adjudication of pendent state law claims against nonconsenting state defendants in federal court" in 1984. (*Raygor, supra,* 534 U.S. at pp. 540-541, citing *Pennhurst State School and Hospital v. Halderman, supra,* 465 U.S. at p. 120.) Thus, well before 1997, the only way to obtain such jurisdiction over a state defendant was through consent. Moreover, the fact that jurisdiction was not discussed in *Carmel-By-The-Sea* strongly suggests that Caltrans did not object to federal court jurisdiction in that case.

18

of action from the federal lawsuit after being notified that Caltrans did not consent to federal court jurisdiction. Keep 70 Safe was notified of Caltrans's intent to move to dismiss the federal lawsuit on September 30, 2020. *Raygor* was cited. Dismissal was inevitable. The promised motion to dismiss was filed on October 9, 2020. We have no difficulty concluding it was reasonable for Keep 70 Safe's attorney to research the matter for himself, rather than take Caltrans's attorneys' word for it. We also agree with the trial court that Caltrans might have changed its mind, so we further conclude that it was reasonable for Keep 70 Safe to wait at least until the motion to dismiss was filed to take any action.

We need not determine, however, whether the trial court correctly concluded that Keep 70 Safe reasonably waited until October 23, 2020, to dismiss the CEQA claims from the federal lawsuit and file them in state court. This is because, as mentioned, 13 days remained on the clock when Keep 70 Safe filed the federal lawsuit, thereby tolling the statute of limitations. Counting back 13 days from when the present lawsuit was filed in state court, October 23, 2020, the dispositive question becomes whether the clock began to run on October 10, 2020, the day after the motion to dismiss was filed, in which case this lawsuit is time-barred by one day.

While the issue of whether the CEQA claims could proceed in federal court against Caltrans notwithstanding its lack of consent was not a complicated one, and while Keep 70 Safe's attorney was put on notice of Caltrans's intent to move to dismiss the CEQA claims from the federal lawsuit on September 30, 2020, we conclude it was not unreasonable for Keep 70 Safe's attorney to have continued to research the matter for at least one day after the motion to dismiss was filed. (See *Addison*, *supra*, 21 Cal.3d at p. 317 [not unreasonable for plaintiffs to file the state court action in February when defendants moved to dismiss the previous November].)

The trial court did not err in applying the doctrine of equitable tolling in this case. We now turn to Keep 70 Safe's appellate contentions.

19

### III

### *Unlawful Piecemealing*

Keep 70 Safe contends the project in this case received unlawful piecemeal review because it is one component of Caltrans's "larger plan 'to achieve the ultimate facility' " described in the 2014 TCR. This is a question of law subject to de novo review on appeal. (*Vineyard*, *supra*, 40 Cal.4th at p. 435.) We conclude no unlawful piecemealing occurred.

"It is well established that ' "CEQA forbids 'piecemeal' review of the significant environmental impacts of a project." ' [Citation.] Rather, CEQA mandates 'that environmental considerations do not become submerged by chopping a large project into many little ones—each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences.' [Citation.] Thus, the term 'project' as used for CEQA purposes is defined broadly as 'the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . .' [Citation.]" (*Paulek v. Department of Water Resources* (2014) 231 Cal.App.4th 35, 45.)

In *Laurel Heights*, *supra*, 47 Cal.3d 376, our Supreme Court articulated the following test for unlawful piecemealing: "[A]n EIR must include an analysis of the environmental effects of future expansion or other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects. Absent these two circumstances, the future expansion need not be considered in the EIR for the proposed project. Of course, if the future action is not considered at that time, it will have to be discussed in a subsequent EIR before the future action can be approved under CEQA." (*Id.* at p. 396.) Applying this test, the court concluded the University of California unlawfully piecemealed environmental review of a project involving the university moving certain research facilities into part of a newly-

20

acquired building (100,000 square feet). That review failed to "discuss the additional environmental effects, if any, that will result from [the university's] use of the remaining 254,000 square feet when it becomes available" even though university officials planned to use the whole building as soon as the current tenant's lease expired. (*Id.* at p. 393; see *id.* at pp. 396-397.) The court concluded "the future expansion and the general types of future activity at the facility are reasonably foreseeable." (*Id.* at p. 397.)

Here, Keep 70 Safe does not assert any failure to consider reasonably foreseeable future action to be taken as a consequence of the highway project in this case. Instead, Keep 70 Safe argues the piecemealing analysis also operates into the past. According to Keep 70 Safe, because the 2014 TCR recommended many highway improvement projects, environmental review of the current project must include either "TCR's 'whole of an action' " or "the cumulative impact of TCR's phases or parts." To the extent Keep 70 Safe argues the entire 2014 TCR must be analyzed, we note the statute of limitations for challenging that document under CEQA has long passed.[8] Nor does it make sense to require an analysis of every proposed highway project along SR 70 in Caltrans's district 3 regardless of how far removed the other proposed projects are from the current project. But even if we read Keep 70 Safe's argument more narrowly to mean the current project's impacts should have been analyzed together with closely-connected projects, such as the Simmerly Slough Bridge Replacement Project at the current project's southern terminus and the Butte 70 Safety and Capacity Project at its northern terminus, both of these projects have already been approved following CEQA review, and the

---

[8] We also agree with Caltrans that "[a] TCR does not bind Caltrans to any specific project but presents an ultimate facility concept for the route to address the [LOS] standards for the route, if fully implemented." It is "an informational resource" that, among other things, "conceptualizes how the corridor should operate, [and] helps inform the regional transportation planning process," but it does not commit Caltrans to any particular action and "does not result in a direct or reasonably foreseeable indirect change in the environment."

21

statute of limitations for challenging the approval of those projects has also expired. Keep 70 Safe does not argue otherwise. Instead, while acknowledging that "a piecemealing challenge to the TCR and its other projects is mooted [(barred)] by [the statute of limitations]," Keep 70 Safe nevertheless asserts the current project must analyze not only reasonably foreseeable future action, as required by *Laurel Heights*, but also the environmental impacts of these other already-reviewed projects.

In making this argument, Keep 70 Safe relies primarily on *Arviv Enterprises, Inc. v. South Valley Area Planning Com.* (2002) 101 Cal.App.4th 1333. There, a developer secured permits to build five hillside houses downslope from Mulholland Drive, a categorical environmental exemption to build two more across the street, and a mitigated negative declaration to build 14 additional houses on an adjacent street. (*Id.* at p. 1336.) When the City of Los Angeles realized this was "in reality a development project for 21 hillside houses," it required an EIR for the entire project. (*Ibid.*) The developer challenged that determination by filing a writ petition in the trial court, relief was denied, and our colleagues at the Second Appellate District affirmed. (*Ibid.*) The court stated: "This entire case is the direct result of inadequate, or misleading, project descriptions." (*Id.* at p. 1346.) Acknowledging that "it is entirely possible a two-house project . . . may in fact have a de minimus, or mitigatable, effect on the local environment," the court explained that the developer "never intended a two or three house project" and instead "always envisioned a 21-house development," as he admitted at the hearing before the planning commission. (*Ibid.*) The court continued: "Apparently[,] the City's planning department staff was never able to link the various projects together until the July 2000 hearing when members of the public complained, not only about the two additional homes . . . but also the 14 on [the adjacent street] then under review, as well as the five existing homes for which [the developer] never sought . . . approval [from the design review board]. [¶] The significance of an accurate project description is manifest, where, as here, cumulative environmental impacts may be disguised or minimized by filing

22

numerous, serial applications. . . . [¶] By the November 2000 hearing[,] the City's planning department agreed it had failed to consider the cumulative effects from the various construction projects under consideration in the sensitive hillside area. It thus recommended the [planning commission] order an EIR to consider the overall effects from the project as a whole." (*Id.* at pp. 1346-1347, fn. omitted.) The court concluded "a review of the entire record demonstrates substantial evidence to support a fair argument the overall project may have substantial environmental effects." (*Id.* at p. 1347.)

Keep 70 Safe's reliance on *Arviv* is misplaced. While, as Keep 70 Safe notes, the *Arviv* court affirmed the trial court's conclusion that an EIR was required for the entire 21-house development even though five of the houses were already built and others were already approved with CEQA exemptions, we cannot agree with Keep 70 Safe's assertion that "[t]here is no difference" between what the developer did in *Arviv* and what Caltrans did in this case. Unlike *Arviv*, there is no evidence in this record that Caltrans sought to evade CEQA review of an intended larger project by misleadingly submitting applications for individual pieces of that project. Instead, each time Caltrans approved a project from the 2014 TCR, that project received CEQA review. Whether that review was adequate with respect to the Simmerly Slough Bridge Replacement Project or the Butte 70 Safety and Capacity Project is not before us. We are concerned here only with the current project, widening the 9.6-mile stretch of SR 70 between these two other projects. As we explain immediately below, unlike the separate pieces of the 21-house development in *Arviv*, the current project has "significant independent or local utility" (*Planning and Conservation League v. Castaic Lake Water Agency* (2010) 180 Cal.App.4th 210, 237 (*Castaic Lake*)) and "can be implemented independently" (*Banning Ranch Conservancy v. City of Newport Beach* (2012) 211 Cal.App.4th 1209, 1223 (*Banning Ranch*) from the other highway improvement projects recommended in the 2014 TCR. These are the dispositive considerations.

In this regard, we find *Del Mar Terrace Conservancy, Inc. v. City Council* (1992) 10 Cal.App.4th 712 (*Del Mar Terrace*) to be particularly instructive.[9]  There, our colleagues at the Fourth Appellate District rejected an unlawful piecemealing challenge to the adequacy of an EIR prepared for a highway project (the State Route 56 West project) that converted 1.8 miles of Carmel Valley Road to a four-lane freeway.  (*Id.* at pp. 719-721.)  After discussing *Laurel Heights*, the court noted there were also contemporaneous plans for an State Route 56 East project, as well as two end segments to connect State Route 56 to Interstate 5 and Interstate 15/State Route 67, but concluded it was uncertain whether or not these potential future projects would be approved by the electorate, distinguishing the case from *Laurel Heights*, where it was clear that the university's plan was to move into the remainder of the new building.  (*Id.* at pp. 731-732.)  The court then approved of the trial court's use of a federal test, stated in *Daly v. Volpe* (9th Cir. 1975) 514 F.2d 1106, for determining whether unlawful piecemealing of a highway project had occurred under NEPA.[10]  (*Del Mar Terrace*, at pp. 732-733.)  This test requires:  (1) the segment of highway under review must be "(a) of substantial length and (b) between logical terminal points (termini) (defined as major crossroads, population centers, major traffic generators, or similar major highway control elements)"; (2) the segment must "have 'independent utility' "; (3) the segment must provide " ' "adequate opportunity for the consideration of alternatives" ' "; and (4) "it must be addressed whether the segment under consideration seems to fulfill important state and local needs,

---

[9]  *Del Mar Terrace* was overruled on another point in *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 569-571 and footnote 2.

[10]  As the court explained, "the trial court acted consistently with the direction of our Supreme Court in *Wildlife Alive v. Chickering* (1976) 18 Cal.3d 190, 201, that since CEQA was modeled on [NEPA], California courts have consistently treated judicial and administrative interpretation of the latter enactment as persuasive authority in interpreting CEQA."  (*Del Mar Terrace*, *supra*, 10 Cal.App.4th at p. 732.)

such as relieving particular traffic congestion." (*Id.* at p. 733.) Applying this test, the court concluded all of the criteria "find support in the record." (*Ibid.*)

Under this test, we conclude the project in this case meets the foregoing criteria. First, the project is of far greater length than the segment at issue in *Del Mar Terrace*. It also has logical termini. As stated previously, this project connects two other highway projects that have previously undergone CEQA review, the Simmerly Slough Bridge Replacement Project at the southern terminus and the Butte 70 Safety and Capacity Project at the northern terminus. Thus, there is no need for the project to extend further north or south.

Second, the project has independent utility. As stated in the final EIR, the project addresses "operational concerns along the corridor" by improving both travel times and the reliable movement of goods "within the regional and local supply chain," and also by "improv[ing] the overall safety of travelers within the corridor." This utility is independent from the other projects because "the projects operate independently of one another and can be implemented separately . . . ." For example, the Simmerly Slough Bridge Replacement Project, replacing a bridge immediately to the south, "fulfills its purpose and need and functions properly without requiring additional improvements elsewhere." Similarly, the Butte 70 Safety and Capacity Project "will construct a five-lane facility" north of the Yuba/Butte County line at Honcut Creek and serves its purpose by improving that Butte County stretch of SR 70 without requiring additional improvements south of the county line. Between these projects is the project at issue in this case. It fulfills its purpose of improving the safety and capacity of SR 70 on the Yuba County side regardless of whether the highway is improved in Butte County to the north and regardless of whether the Simmerly Slough Bridge is replaced to the south.

Third, as we discuss in the next section of this opinion, the segment of SR 70 comprising the project provided an adequate opportunity for the consideration of alternatives. And finally, the current project to improve SR 70 between the Simmerly

Slough Bridge and the Butte County line appears to fulfill important local needs within Yuba County north of Marysville, particularly improving safety and relieving traffic congestion along this segment of the highway. Again, this is so regardless of the other projects to the north and south. (See *Castaic Lake*, *supra*, 180 Cal.App.4th at p. 237 [discussing *Del Mar Terrace* and concluding a water transfer project had "significant independent or local utility, in view of its benefits to Castaic's service area and relative autonomy from" a broader water delivery agreement]; *Banning Ranch*, *supra*, 211 Cal.App.4th at p. 1226 [park project and residential development project "serve different purposes" and "the City can and will build the park regardless of" the residential development].)

Having reviewed the matter independently, we conclude no unlawful piecemealing occurred.

## IV

### *Adequacy of Alternatives Considered*

Keep 70 Safe also claims the final EIR did not consider an adequate range of alternatives. We disagree.

Our Supreme Court set forth the standard for analyzing such a claim in *Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553 (*Goleta Valley*):

"The core of an EIR is the mitigation and alternatives sections. The Legislature has declared it the policy of the State to 'consider alternatives to proposed actions affecting the environment.' [Citations.] Section 21002.1, subdivision (a) . . . provides: 'The purpose of an environmental impact report is to identify the significant effects of a project on the environment, *to identify alternatives to the project*, and to indicate the manner in which those significant effects can be mitigated or avoided.' [Citations.]

"In determining the nature and scope of alternatives to be examined in an EIR, the Legislature has decreed that local agencies shall be guided by the doctrine of 'feasibility.' '[I]t is the policy of the state that public agencies should not approve projects as proposed

26

if there are *feasible alternatives* or *feasible mitigation measures* available which would substantially lessen the significant environmental effects of such projects . . . . [I]n the event specific economic, social, or other conditions make infeasible such project alternatives or such mitigation measures, individual projects may be approved in spite of one or more significant effects thereof.' [Citation.]

"The Legislature has defined 'feasible,' for purposes of CEQA review, as 'capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors.' [Citations.] Both the California and the federal courts have further declared that '[t]he statutory requirements for consideration of alternatives must be judged against a rule of reason.' [Citations.] As we have explained, 'One of [an EIR's] major functions . . . is to ensure that *all reasonable alternatives* to proposed projects are thoroughly assessed by the responsible official.' [Citations.]

"These statutory and judicial concepts are carried forward in the Guidelines, which state that an EIR must '[d]escribe a range of reasonable *alternatives to the project, or to the location of the project*, which could feasibly attain the basic objectives of the project, and evaluate the comparative merits of the alternatives.' [Citation.] As the underscored language suggests, project alternatives typically fall into one of two categories: on-site alternatives, which generally consist of different uses of the land under consideration; and off-site alternatives, which usually involve similar uses at different locations. [Citations.]

"CEQA establishes no categorical legal imperative as to the scope of alternatives to be analyzed in an EIR. Each case must be evaluated on its facts, which in turn must be reviewed in light of the statutory purpose. Informed by that purpose, we here reaffirm the principle that an EIR for any project subject to CEQA review must consider a reasonable range of alternatives to the project, *or to the location of the project*, which: (1) offer substantial environmental advantages over the project proposal [citation]; and (2) may be 'feasibly accomplished in a successful manner' considering the economic,

27

environmental, social and technological factors involved. [Citations.]" (*Goleta Valley*, *supra*, 52 Cal.3d at pp. 564-566, fn. omitted.)

Returning to *Del Mar Terrace*, the court concluded the EIR in that case satisfied the rule of reason set forth above and rejected the plaintiff's argument that "the narrowly defined project description and an allegedly predetermined alignment of the project along Carmel Valley Road" made the feasible alternatives analysis "cursory and incomplete." (*Del Mar Terrace*, *supra*, 10 Cal.App.4th at p. 739.) There, in addition to the no project alternative, the EIR discussed three other potential alignments and rejected each with reasons. (*Id*. at p. 740.) The court also noted planning commission records indicated "alternative route alignments for SR 56 West were studied by Caltrans beginning in 1962" and "the studies made had pretty well exhausted all of the possible alternatives and any other variables that might take place." (*Ibid*.)

Here, the final EIR specifically analyzed a no project alternative and two project alternatives. Keep 70 Safe complains that the two build alternatives are "nearly identical," but cites no decisional authority for the proposition that similarity is fatal to an EIR's assessment of alternatives. In any event, as explained more fully previously, although both alternatives include an additional 12-foot lane with an 8-foot shoulder to achieve a continuous passing lane in each direction, and also include a CRZ with a minimum width of 20 feet, side slopes, and roadside ditches outside the CRZ, alternative 1 retains the safety project's 14-foot two-way left turn lane, "resulting in a five-lane facility," while alternative 2 does not retain that turn lane and instead installs a 14-foot median with a concrete barrier dividing the two lanes of travel in each direction. We conclude the two alternatives are different enough to satisfy the rule of reason set forth above.

Keep 70 Safe also objects that the EIR does not analyze the safety project as a separate alternative. However, all alternatives assumed the existence of the safety project's improvements, as that project was approved separately and would be completed

regardless of whether the project under review was approved or not.  Moreover, these safety improvements, would not achieve one of the primary objectives of the project, alleviating the operational deficiencies of SR 70.

Keep 70 Safe further asserts that other alternatives should have been analyzed. However, as in *Del Mar Terrace*, other alternatives were considered at the concept level. As the final EIR explained, an alternative alignment was originally envisioned, "a four-lane 'Marysville By-Pass to Oroville Freeway' beginning at the SR 65/SR 70 split and extending to the southern limits of Oroville."  However, this alternative alignment was abandoned as an option "[d]ue to lack of funding and significant environmental impacts" identified in a 2001 study.  Nor does Keep 70 Safe adequately explain why "[a]n alternative with less lanes" should have been analyzed, particularly in light of the fact that both alternatives with two lanes in each direction were found to have a less than significant impact on the environment.

Finally, we also reject Keep 70 Safe's objections to the no project alternative as "but another *feasible* 'build' alternative."  This objection is based on the fact that the EIR assumed the existence of the safety project's safety improvements.  However, as stated previously, that project was approved separately and would be completed regardless of whether the project under review was approved or not.  It would make no sense for the no project alternative to assume the safety project would somehow be undone.

For the foregoing reasons, we conclude the rule of reason has been satisfied.

## V

### *Findings and Mitigation Measures*

Keep 70 Safe further asserts Caltrans was required, as a procedural matter, to make certain findings and commit to various mitigation measures because the final EIR identified significant environmental impacts.  Not so.

Section 21081 provides:  "[N]o public agency shall approve or carry out a project for which an environmental impact report has been certified which identifies one or more

significant effects on the environment that would occur if the project is approved or carried out unless both of the following occur: [¶] (a) The public agency makes one or more of the following findings with respect to each significant effect: [¶] (1) Changes or alterations have been required in, or incorporated into, the project which mitigate or avoid the significant effects on the environment. [¶] (2) Those changes or alterations are within the responsibility and jurisdiction of another public agency and have been, or can and should be, adopted by that other agency. [¶] (3) Specific economic, legal, social, technological, or other considerations, including considerations for the provision of employment opportunities for highly trained workers, make infeasible the mitigation measures or alternatives identified in the environmental impact report. [¶] (b) With respect to significant effects which were subject to a finding under paragraph (3) of subdivision (a), the public agency finds that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment."

Thus, in order for Keep 70 Safe's argument to succeed, the final EIR must have identified one or more significant effects to the environment. Keep 70 Safe asserts this is the case with respect to biological impacts.[11] However, after explaining that the project would impact various environmental resources, including biological resources, the final EIR states: "The project would not contribute to cumulatively considerable effects to the resources analyzed." The final EIR then indicates that a summary of "the significance of impacts under CEQA" is contained in table S-4. The portion of that table relating to

---

**11** Keep 70 Safe also argues findings and mitigation measures were required for hydrological impacts, aesthetic impacts, cultural impacts, geological impacts, release of hazardous material, traffic impacts, and impacts to emergency services, while simultaneously acknowledging that the final EIR concluded no significant impacts would occur. These arguments are more appropriately addressed as challenges to the sufficiency of the evidence supporting the conclusion of less than significant impact. We do so later in this opinion.

30

biological resources is divided into six categories. With respect to the first category (effects on candidate, sensitive, or special-status species), the table indicates both project alternatives would have *no impact*. With respect to the next two categories (effects on riparian habitat or other sensitive natural communities, and effects on wetlands), the table indicates a less than significant impact for both project alternatives *without mitigation*. And with respect to the final three categories (effects on the movement of migratory fish or other wildlife, whether the project conflicts with local policies or ordinances protecting biological resources, and whether the project conflicts with various conservation plans), the table indicates both project alternatives would have *no impact*.

Nevertheless, Keep 70 Safe asserts the final EIR does find significant effects to the environment, noting the document identifies various mitigation measures for biological resources, such as compensation for loss of riparian habitat and wetlands, and also states later in the document that the second and third categories of potential impact noted above (impacts to riparian habitat and wetlands) are less than significant *with mitigation incorporated*.

In response, Caltrans admits these portions of the final EIR exist, but "stands by its determination that the impact is less than significant without mitigation," as stated elsewhere in the final EIR. With respect to the identified mitigation measures, Caltrans argues: "As discussed in the EIR, 'compensation for loss of riparian habitat is generally required by [the resource] agencies' as a permit condition, regardless of whether or not the impact is considered significant under CEQA. [Citations.] Thus, the compensation identified is not a mitigation measure required as a condition of approval by Caltrans or because a significant effect was identified, but it is expected to be incorporated into a permit by the appropriate resource agency." With respect to the claimed finding of less than significant impact with mitigation, Caltrans argues: "The statements that the impacts are less than significant with mitigation are inadvertent misstatements. They capture the concept that the impact is less than significant and is consistent with Caltrans'

31

belief that compensation will be required by permitting agencies. However, it misstates the finding that the impact is determined to be less than significant without mitigation, which is the finding identified elsewhere in the EIR, reaffirmed in the [notice of determination], and admitted to in [Keep 70 Safe's writ petition]."

Viewing the totality of the final EIR, we conclude the finding of no significant impact without mitigation is clear. Whether that finding is supported by substantial evidence is another matter. We turn to that question now.

## VI

### *Sufficiency of the Evidence*

Finally, Keep 70 Safe challenges the sufficiency of the evidence supporting the final EIR's findings of no significant impact in seven areas of potential environmental harm: (1) biological; (2) cultural; (3) aesthetic; (4) geological; (5) hydrological/water quality; (6) transportation and emergency response/evacuation plans; (7) hazardous materials. We conclude the findings are supported by substantial evidence.

As stated previously, "[i]n reviewing for substantial evidence, the reviewing court 'may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable,' for, on factual questions, our task 'is not to weigh conflicting evidence and determine who has the better argument.' [Citation.]" (*Vineyard*, *supra*, 40 Cal.4th at p. 435.) "In applying the substantial evidence standard, 'the reviewing court must resolve reasonable doubts in favor of the administrative finding and decision.' [Citation.] The Guidelines define 'substantial evidence' as 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' [Citation.]" (*Laurel Heights*, *supra*, 47 Cal.3d at pp. 392-393.)

## A.

### *Biological Impacts*

Keep 70 Safe claims the project's "biological impacts are undisputed" and suggests the project will impact 44 threatened, endangered, or nonlisted special status plant and wildlife species. However, as the final EIR makes clear, of the seven special status animal species initially identified as potentially occurring in the vicinity of the project, a field study concluded that only four such species have suitable foraging habitat in the project area, and only one was actually "considered to potentially occur in the vicinity." Similarly, of the 10 special status plant species initially identified as potentially occurring in the project area, the field study determined none are actually "anticipated to occur in the project area." With respect to the 16 threatened or endangered wildlife species initially identified as potentially occurring in the project area, the field study "determined that 14 of the 16 species would not occur in the study area because it lacks suitable habitat for the species or is outside the species' known range," leaving one threatened insect that "may occur in the study area" and one threatened bird that "has limited potential foraging and nesting habitat in the study area." Finally, with respect to the 11 threatened or endangered plant species initially identified as potentially occurring in the project area, the field study concluded none are actually "anticipated to occur in the project area."

Thus, far from Keep 70 Safe's suggestion of impact to 44 threatened, endangered, or special status plants and animals, the final EIR indicates potential impact to three: one special status bird, one threatened insect, and one threatened bird. The final EIR discusses the potential impact to these birds due to tree removal and trimming along the highway and clearing of ruderal vegetation. The final EIR also specifically discusses the potential impact to the two threatened species. Keep 70 Safe does not provide this discussion in its opening brief, and has therefore not carried its burden of laying out the

33

evidence favorable to the other side and showing why it is lacking.[12] (See *King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 850-851 (*King & Gardiner*); *Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1572 (*Pfeiffer*).)

Keep 70 Safe also argues the project will significantly impact riparian habitat and wetlands without mitigation. The final EIR does state, as Keep 70 Safe notes, that the project "would encroach on the upland valley foothill riparian habitat" and "the riparian wetland" in the biological study area, resulting in permanent impacts to 0.24 acres of riparian habitat and 0.58 acres of wetland. Permanent impacts to the foothill riparian habitat would come from "the removal of woody riparian vegetation" and such impacts to the wetland would come from "the placement of permanent fill in the riparian wetland."

Keep 70 Safe asserts the final EIR overlooks these impacts and cites a CEQA Guideline setting out the requirements for an EIR's discussion of the project's environmental setting. That Guideline states: "Special emphasis should be placed on environmental resources that are rare or unique to that region and would be affected by the project. The EIR must demonstrate that the significant environmental impacts of the proposed project were adequately investigated and discussed and it must permit the significant effects of the project to be considered in the full environmental context." (Guidelines, § 15125, subd. (c).) What Keep 70 Safe does not do is adequately explain how the final EIR in this case runs afoul of this Guideline. The impacts to the riparian habitat and wetlands are thoroughly discussed in the final EIR. Disagreement with Caltrans's conclusion that these impacts are less than significant without mitigation does

---

**12** This failure will be a persistent theme from here on out. It stems from Keep 70 Safe's erroneous assertion that Caltrans found significant impact to the environment, and therefore "failed CEQA's *procedural* mandates" to make certain required findings and commit to mitigation measures. However, as we have already explained, the substantial evidence test applies to these claims.

not render the EIR inadequate. And again, Keep 70 Safe's failure to provide this discussion in its opening brief prevents it from successfully challenging the sufficiency of the evidence on this point. (*King & Gardiner*, *supra*, 45 Cal.App.5th at pp. 850-851; *Pfeiffer*, *supra*, 200 Cal.App.4th at p. 1572.)

Nor are we persuaded by Keep 70 Safe's argument that Caltrans is "disclaim[ing]" its duty to mitigate by noting that "*other* agencies" will require mitigation as part of their permitting process. The final EIR does state with respect to loss of riparian habitat that the Department of Fish and Wildlife regulates activities involving the "disturbance of riparian vegetation" and may include in a permit for such activities "conditions that include avoiding or minimizing vegetation removal, . . . and restoring degraded sites or compensating for permanent habitat losses." The final EIR also states with respect to the wetland impact: "State and federal agencies will require avoidance, minimization, and compensatory mitigation for the loss of riparian wetland habitat. Implementation of the avoidance and minimization efforts described below would minimize the impacts on riparian wetlands. Additional mitigation is proposed to compensate for the permanent loss of riparian wetlands."

First, these portions of the final EIR confirm our previous conclusion that the manifest intention of the document was to conclude no significant impact without mitigation required as a condition of project approval under CEQA. Instead, Caltrans expected any required mitigation "to be incorporated into a permit by the appropriate resource agency," not in order to comply with CEQA, but as required by other areas of environmental law. Second, and more importantly for present purposes, even without such mitigation, Caltrans determined the impact would be less than significant under CEQA. Keep 70 Safe has failed to carry its burden of showing the evidence is insufficient to support that conclusion.

**B.**

*Cultural Impacts*

Keep 70 Safe takes issue with Caltrans's determination that the project would not significantly impact archaeological/paleontological resources "despite *acknowledging* the potential of discovering those during construction" and proposing various mitigation measures, including a requirement that work on the roadway stop in the event cultural materials or human remains are discovered. However, Caltrans performed a record search for any recorded cultural resources within a half-mile radius of the relevant area, consulted with potentially interested parties, and conducted a survey. No "known [National Register of Historic Places]-eligible, [National Register of Historic Places]-listed, or previously unevaluated archaeological resources" were identified. The area in question also has "a low potential for buried archaeological sites overall." Again, Keep 70 Safe does not set forth the final EIR's analysis regarding the significance of cultural impacts and therefore cannot successfully challenge the sufficiency of the evidence supporting the determination of less than significant impact. (*King & Gardiner*, *supra*, 45 Cal.App.5th at pp. 850-851; *Pfeiffer*, *supra*, 200 Cal.App.4th at p. 1572.)

Nor does the fact that the EIR identified various measures designed to ensure that no significant impacts occur mean that without these measures the impact would be significant. As Caltrans points out: "The measure . . . for the discovery of unknown cultural resources is a standard practice. [Citations.] And the process described for the discovery of human remains is the process required by Health and Safety Code [section] 7050.5 and Public Resources Code [section] 5097.98. Both of these measures apply to every Caltrans project regardless of whether the impact is significant or less than significant." And as Caltrans also points out, citing our decision in *Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912 (*Tracy First*), an EIR may rely on compliance with legal requirements or standards in determining whether there are significant impacts. (*Id.* at p. 934 & fn. 7.) Again, Keep 70 Safe has not carried its burden.

## C.

### *Aesthetic Impacts*

Keep 70 Safe also takes issue with Caltrans's determination that the project would not significantly impact the visual character or quality of the site and its surroundings "despite acknowledging that '[t]he loss of vegetation and orchard planting would have a moderate effect on the spatial character adjacent to the roadsides.' " Keep 70 Safe argues this acknowledged moderate effect must be significant and notes the final EIR proposed mitigation measures for replacing vegetation affected by the project.[13] We disagree with the suggestion that the word "moderate" in the final EIR's discussion of impacts necessarily requires a finding of significant impact. As Keep 70 Safe does not set forth the remainder of that discussion, which explains the reasoning behind the ultimate finding of less than significant impact, it cannot succeed in this claim. (*King & Gardiner*, *supra*, 45 Cal.App.5th at pp. 850-851; *Pfeiffer*, *supra*, 200 Cal.App.4th at p. 1572.) And again, the fact that the EIR identified various measures designed to ensure that no significant impacts occur does not mean that without these measures the impact would be significant.

## D.

### *Geological Impacts*

Keep 70 Safe further asserts the final EIR "inconsistently concluded" that the project would have less than significant geological impacts because it finds a low risk of potential soil expansion while also finding " '[t]he project area is located on soils known to be expansive . . . and have low strength[.]' " Keep 70 Safe also notes the final EIR

---

**13** Keep 70 Safe also mentions the final EIR's conclusion that "[n]o new sources of light or glare are anticipated," and suggests this is inconsistent with another proposed mitigation measure for shielding nighttime construction lighting. However, Keep 70 Safe does not actually argue this particular alleged inconsistency renders the finding of less than significant impact unsupported by substantial evidence.

identifies a measure to be used to "minimize the potential for soil instability" during the construction process.

However, setting this claimed inconsistency aside, Keep 70 Safe is not contending that the project is impacting the soil quality at all, or that it will exacerbate an existing condition of soil expansiveness. As Caltrans notes, expansive soils are an existing condition. An agency is "not required to analyze the impact of existing environmental conditions" on a project, but rather, "the *project's* impact on the environment." (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 377.) Nor does the soil instability minimization measure noted above support Keep 70 Safe's argument that without this measure the project would significantly impact the environment. Keep 70 Safe has not demonstrated a lack of substantial evidence to support the finding of less than significant impact.

## E.

### *Hydrology/Water Quality*

Keep 70 Safe also claims that the finding of less than significant impact to hydrology and water quality is unsupported because the final EIR "acknowledged the [p]roject would result in an increase in new impervious surfaces, increasing the discharge of sediments and other pollutants in stormwater runoff," as well as "increas[ing] erosion and soil deposition into surface waters during the construction phase." Keep 70 Safe also notes a reduced ability for groundwater recharge, resulting in longitudinal floodplain encroachment.

Once again, Keep 70 Safe does not lay out the final EIR's analysis with respect to the impact the increase in impervious surfaces would have on hydrology. The EIR explains why no significant impact will occur. Without setting forth that reasoning in the opening brief, Keep 70 Safe cannot successfully challenge the sufficiency of the evidence supporting the conclusion reached. (*King & Gardiner*, *supra*, 45 Cal.App.5th at pp. 850-851; *Pfeiffer*, *supra*, 200 Cal.App.4th at p. 1572.)

With respect to water quality and storm water runoff, the final EIR sets forth the strict regulatory scheme applicable to the project, describes the affected watershed in detail, and then provides five paragraphs of analysis, ultimately concluding a less than significant impact would result. And again, Keep 70 Safe does not lay out this analysis. Instead, Keep 70 Safe notes that the EIR "proposed three [mitigation measures], requiring the use of [best management practices], operational protocols, and permanent treatment measures." (Italics omitted.) More precisely, these measures explain that Caltrans would be complying with a National Pollutant Discharge Elimination System (NPDES) permit, implementing a Storm Water Pollution Prevention Plan (SWPPP), complying with existing best management practices, and evaluating those practices to determine whether or not increased volumes meet approved thresholds contained in Caltrans's Municipal Separate Storm Sewer Systems (MS4) permit. As stated previously, an EIR may rely on compliance with legal requirements or standards in determining whether there are significant impacts. (*Tracy First*, *supra*, 177 Cal.App.4th at p. 934 & fn. 7.) Keep 70 Safe has not carried its burden of demonstrating insufficient evidence.

**F.**

*Transportation and Emergency Response/Evacuation Plans*

Keep 70 Safe additionally complains that the final EIR found the project would have less than significant impacts to transportation and emergency response/evacuation plans "despite conceding there would be 'temporary disruptions to the existing highway during the construction period.' " However, the final EIR also makes clear that two-way operation of SR 70 would be maintained for most of the construction period, any one-way traffic control would be limited to off-peak times, and Caltrans would coordinate any period of one-way traffic control with emergency services. Keep 70 Safe claims that these measures are mitigation measures, so Caltrans could not conclude the project's impact is less than significant without mitigation. Not so. As Caltrans explains, implementation of a traffic management plan is a standard practice for all highway

39

projects and not a mitigation measure. (See *Berkeley Hillside Preservation v. City of Berkeley* (2015) 241 Cal.App.4th 943, 960.) Moreover, notwithstanding the assertion that Caltrans has simply "*presumed*" that these traffic management procedures will work, this assertion does not satisfy Keep 70 Safe's burden of demonstrating a lack of substantial evidence, particularly in light of the fact that it, once again, has not provided the EIR's full analysis on this point. (*King & Gardiner*, *supra*, 45 Cal.App.5th at pp. 850-851; *Pfeiffer*, *supra*, 200 Cal.App.4th at p. 1572.)

Keep 70 Safe also takes issue with the conclusion that the project's "induced-travel" impacts would be less than significant, and further asserts that the final EIR failed to disclose or analyze the project's cumulative transportation impacts. We again conclude Keep 70 Safe has not carried its burden of setting forth all of the evidence favorable to Caltrans and showing why it is lacking. (*King & Gardiner*, *supra*, 45 Cal.App.5th at pp. 850-851; *Pfeiffer*, *supra*, 200 Cal.App.4th at p. 1572.)

## G.

### *Hazardous Materials*

Finally, Keep 70 Safe's argument with respect to the conclusion that the project would not significantly impact the release of hazardous materials is another attempt to cast standard practices, the following of which would result in a less than significant impact, as mitigation measures designed to mitigate a significant impact. For the reasons stated above with respect to the traffic management plan, such standard practices are not mitigation measures.

As Keep 70 Safe has not described these standard practices in the opening brief, it has not carried its burden to demonstrate the conclusion of a less than significant impact is unsupported by substantial evidence.

40

# DISPOSITION

The judgment is affirmed. Caltrans is entitled to costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

/s/
HOCH, J.*

We concur:

/s/
HULL, Acting P. J.

/s/
MAURO, J.

* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.